So he's not here anymore. Oh, I think I saw him. Yeah. Good morning. Good morning. I'll call the case of the United States v. Salomon Melgen. And I'll give everybody a moment to get settled. Okay. Actually, I've been by myself for 17 seconds. Good morning. May it please the court, good morning. My name is Kirk Ogrosky on behalf of Dr. Salomon Melgen. Happy Valentine's Day to everyone. That might be the only time I hear that today, so thank you. This is a medical necessity case. There was no direct evidence of intent put on by the government. The government called four employees from Dr. Melgen's practice and the defense called five employees. All testified they saw nothing improper or illegal at his medical practice. DOJ, through the process of the trial, focused on 30 patients that were cherry-picked out of a patient population of over 3,000. And they picked those because they were the worst mistakes. I'm going to ask you to reverse this conviction as we go through these issues. There are a lot of issues that are in these briefs. I plan to start with the peer comparison chart issue. But I invite the court to steer me, So if there's one thing that the Department of Justice and Dr. Melgen agree upon, it's that the peer comparison charts were outrageous. They were ridiculous, according to the words of the prosecutor in closing. And they argued throughout the closing, if you don't believe the tests were excessive, compare Melgen to the rest of the retinal specialists. The charts were up throughout the closing. These charts were impermissible. They're testimonial. They violated Rule 1006. They were not summary exhibits. They had nothing to do with a summary. They were the prosecutor's charts prepared for litigation. And they violated the confrontation clause because the witness who sponsored the charts, an analyst for the FBI, when asked on cross-examination, why would this person be a peer of Dr. Melgen? Oh, I don't know. You'll have to ask the Department of Justice. Well, we cannot cross a prosecutor in a criminal case. Is there any reason that your client couldn't have created his own peer comparisons with what your team thought were more accurate comparisons? Well, there is absolutely no reason we couldn't have hired an expert. We would have hired a biostatistician to review his patient base, to look at his practice, number of offices, employees, disease states. And we could have done that. The problem is we didn't do that. We didn't provide expert notice. And the government didn't notice any expert. So we got to the last witness after weeks of trial in the government's case in chief, where the judge reversed his ruling under 702 and said, well, we don't need an expert for this. This is based on the data. We'll let it in as a summary of data. It was not a summary of data. It was a litigating position. It was a chart that was outrageous, created to achieve conviction, and it did just that. Did you also have the raw data that it was based on? When you say raw data, we had all the raw data, but the raw data means all data from Medicare. The selection process in determining peers was to go into the Medicare database at the direction of the prosecutor and pick people that they deemed to be peers. And we know for a fact, based on the testimony, they were not peers. In fact, the first patient... So when he reversed his ruling, there was a weekend,  and we asked Ms. Minton about Dr. Cartwright. Dr. Cartwright is on your list as a peer. Is he a retinal specialist? Here's some information about him just right off the internet. Is he a retinal specialist? No, he's a plastic surgeon. Next doctor. We asked about another doctor. Same thing. They were not his peers. So why is this so important? Dr. Melgen was a doctor who was the doctor of last resort for people that were really sick. Even the 30 cherry-picked patients that the government used had been referred by other ophthalmologists to Dr. Melgen for specialized treatment. And you see that in the summary exhibit RL1, which lists all the referrals from all these ophthalmologists. So if the question is, could we have hired an expert? Sure, we could have. We didn't notice one. And we had three days before crossing Ms. Minton. But we had a problem with the fact that these were not summary exhibits. These were testimonial in nature. And when Ms. Minton is on the stand testifying, she can't answer questions about these supposed peers. Did the jury hear the criteria that were used to construct this peer list? Yes, parroted from Ms. Minton, who is a mere conduit of what the prosecutors wanted. And the judge, in making his ruling, had heard several of the criteria. But he hadn't heard all of them. He heard some of them live for the first time after he had admitted the exhibits. So we moved to exclude all of this under United States v. Chibber, which does a nice job of analyzing this type of issue, both at the district court and the circuit court. Obviously, it's not in the circuit. I want to point out that Chibber focuses on 702. Of course, if you had an expert, an expert can rely on hearsay. When you have a person on the stand who's not an expert, who's putting in a summary, supposed summary, there has to be a basis. So if we go back and look at what happened here, this was, under Bullcoming, what was a chart that sought to prove past events potentially relevant to the prosecution. And we know that for what they did throughout the closing argument. If you don't believe these are excessive, look at our charts. Look at our charts for intent. These were unnecessary. That's what they did throughout the closing. If there were, say, 10 other doctors who had, or even one other doctor who had also billed $90 million of these types of procedures, couldn't you have shown those to the jury and said these are his real comparators and then the jury could decide which side they believe? Isn't that what the jury's supposed to do? Well, I'm not sure that would have been relevant from the defense perspective to bring in other doctors. I mean, we're presupposing that there's some relevance in a criminal trial to comparing a defendant to someone else, particularly where you're talking about subjective medical decision-making. So having the opportunity to retain an expert to rebut an impermissible summary is not an appropriate remedy. This is an issue that you have under de novo review, under the Confrontation Clause issue. Dr. Melgen was prevented from confronting the people that created the charts, which were the prosecutors. This was not a business record. The data was not pulled from Medicare in a form that it existed in Medicare. It took judgment and decision-making for the agent to find which peers to pull. And we know that she was wrong and the judge let it in anyway. This is reversible error, and taking the words from the prosecutors at closing, these were truly ridiculous charts. And there may well be a number of peers that are out there, Judge Grant, that are in fact comparable, but that analysis was never done, not by the government and not by the defense. And I would just point out that using a summary exhibit, 1006, is not a backdoor vehicle to introduce impermissible hearsay. That's law in the 11th Circuit. Given the time, let me move to a different issue. The multi-dosing issue in this case was one that we, from the very beginning, moved to exclude. We moved to strike the language in the indictment. It's not criminal. It's a complex regulatory question that at the time of trial was still pending in litigation. So we sought to dismiss the indictment and strike the language of multi-dosing from the indictment, which is included in the 1347 charge. The judge denied that, so we moved in limine under Rule 403 to exclude this regulatory issue from trial. The judge denied that. The issue that was discussed in those hearings was profit motive. The judge said, well, if it goes to profit motive, then doesn't it come in? And he issued a written order on this. Any white-collar case that involves money involves a profit motive. Inserting a regulatory issue like multi-dosing really tainted the trial and turned it into a trial within a trial. And the perfect example of that was Dr. Melgen was forced to call his regulatory attorney to explain the process of how he went through the appeals with HHS, how he appealed to the district court, the arguments he made, his beliefs about that process. And then the attorney had to explain he paid back over $10 million before indictment to even get to court. You know, I'm asking this question from the standpoint of a panel that has to review evidentiary rulings. Do you need water? Yes. Okay, thank you. Review evidentiary rulings on an abuse of discretion standard. And, you know, if the district court thought that the jury needed to hear that information to show that Dr. Melgen had noticed that this was improper, it's just hard to say we can go behind the district judge on an abuse of discretion. Let me tell you why you should. All right. There is nothing improper about multidosing. HHS encourages multidosing for a number of drugs. Avastin is one that they encourage multidosing. You look at this circuit's decision. This circuit has decided and said this is fiscally neutral to Medicare. So this is a fraud case, but they're inserting something that's fiscally neutral to Medicare. And the decision in the circuit is we're going to defer to the agency's judgment and accept their view, regardless of whether Dr. Melgen... Here's a hypothetical, though. Let's say that a doctor was charged with giving hip replacements to people who everyone agreed did not need those hip replacements. And there were two types of hip replacement that were separately covered by Medicaid. And one reimbursed for whatever reason at a much higher rate. Couldn't it be evidence that this person was intending to get high reimbursements by always doing the higher reimbursed hip replacement rather than the lower on these patients who didn't need a hip replacement at all, even though both of those were legal and reimbursable? So if you start from the standpoint that nobody needed them to begin with, yes, your analysis would be true. If the doctor gave the more expensive one, but nobody needed it, that's a fine example. The problem here is there is disputed evidence whether these patients needed it. This is the only case in this circuit or any circuit that we have found where the Department of Justice brought a medical necessity case focused not on the doctor's diagnosis, but on the billing code, the ICD-9 code that's on the claims form. All of the testimony from all of their experts dealt with the billing code. They had the medical files. They knew the doctor's actual diagnosis, and they didn't even ask their experts to evaluate it. If you look at chart RL1, it lists, it's a summary chart of the medical files that lists Dr. Melgen's diagnosis. Not one expert opinion from three different experts actually looked at Dr. Melgen's actual diagnosis. So we start from the position that the record is empty in terms of evaluating his actual diagnosis. So let me touch on a few issues very quickly. But you're right, Rule 403 under abusive discretion, but this was an abuse. Inserting this created a trial within a trial where Dr. Melgen was forced to call his regulatory lawyer and a number of other witnesses to talk about an issue that was not illegal or even improper. They just wanted to insert it. Given the time, they have not addressed the fact that they put false testimony with their first two witnesses. They have not addressed the fact that the judge sent a speaking indictment with these outrageous claims, sent 12 copies back to the jury during deliberations with no notice to the defense for an hour and a half. They claim we waived that during the deliberations that had been going on for an hour and a half. You know, you've saved time for rebuttal, so we'll hear from you. Thank you. Thank you. May it please the court, good morning. John Shipley for the United States. Are you the one that called the charts ridiculous? I was not in this instance. But those who did are here. These are the trial counsel. Good morning. And before I get started, thank you to this court for accommodating my schedule change due to my trial. I know that that's difficult once a calendar has been issued to move. You know, you were lucky to be the first to ask. I know from Mr. Srebnick that I got a benefit, he did not. So I appreciate the court's indulgence in that, and I know that was an exception. We always try to do that when we can, but we're glad to see you in any event. I'm happy to be here. Let me go right to the peer comparison evidence. And the fact is, as the court observed, both of these issues that the defense talked about are abuse of discretion issues. And the language in our circuit is not even just abuse of discretion for evidentiary issues, it's clear abuse of discretion, which means that even if this court had a different take on the issue, it really has to be outside the range of reasonable choices a district judge can make. This was, as you can tell from the briefs, hotly contested litigation. It's really remarkable, virtually every issue and every ruling from this district judge, a very experienced one, was litigated to the hilt by both sides. So there are no rulings I submit in this case, and certainly not on these evidentiary issues, that were done carelessly or without thought. On the issue of the peer comparison evidence, let me point out a couple of clarifications. First of all, this is not hearsay. This is Medicare data. This is classic business record information under this circuit's case law, Hoffman-Villay. So the hearsay argument has no traction whatsoever. Exactly as you observed, Judge Grant, and I know you've written about some of these issues with summaries in the Palmer case. I think you were on that panel. The underlying data is admissible, which it clearly is in this instance. You don't have a hearsay problem, and you also don't have a confrontation clause problem. The criteria that were applied to extract the data aren't assumptions. This is not a case involving projections or estimates or speculation. This is really a data poll. This is the prosecutors and the government going back to look at this data, which otherwise would have been enormous and voluminous, exactly as 1006 contemplates for a summary, and saying, what are the criteria we're going to use to pull the information out? And the fact is, if you had looked just without these criteria, the exaggeration between this defendant and anybody else would have been even greater. If you had had all ophthalmologists, it only would have increased the gap between what he did and what regular practitioners do. So why didn't he do it that way? I think it's an effort to be more persuasive and fair to the jury, because I think you would have had a defense argument then that said, look, this is an unfair comparison. How can you compare the amount of Lucentis being given to an ordinary ophthalmologist who wouldn't be using this particular drug to treat anything? So I think that would be unfair, and it would have lent itself to a defense argument. The criteria were threefold. 500 or more Lucentis injections as a way to differentiate retina specialists from ophthalmologists in general. That was rooted in the trial testimony of both of the government's experts, Haller and Fine. Both testified that's a reasonable marker for identifying a retina specialist, which is not its own specialty practice code under Medicare. The second was more than 2,000 patients, which is consistent Medicare billed patients, which is consistent with the defendant's number during the relevant period, which was about 2,294 people, I think. And then the third criteria was simply that you actually made a claim during each of the six years. Just simply, again, to avoid any individuals who might have done a lot of practice in the beginning and then not at the end. So these are very reasonable criteria of raw data. This is a data poll. This isn't an estimate. It's not a projection. It's not any of the considerations that sometimes come into play with summary charts that have raised concern and would raise concern otherwise. And as Judge Grant, you observed all of this was available to them. I mean, there was simply no debate that they could have come in with any criteria they wanted and said, this is misleading, members of the jury. This man was not that much of an outlier. The fact is, it was relevant to this case because the defense, as the court is aware, was in part that all of these... I don't even want to use the word mistakes. That's their word, that these billing errors and the charge counts were mistakes. These things happen, and it resulted from a system that, from our lights of things, was absolutely a fraud scam and a fraud system. They say it was simply errors because of this pre-prepping system where they would, I think shockingly, actually put diagnoses and test results on patient charts before they even came in. That was the defense. This was a mistake. So this shows that, wait a second, we all make mistakes once or twice or maybe a few times, but the scale on which his false diagnoses and false billing... It's not just false billing in this case. It's false diagnosis. It's the whole wet ARMD diagnosis in particular which gave him the basis to bill for these Lucentis injections that created the hugest gap in terms of how much money he generated. But it went directly to that defense of mistakes. Once or twice is one thing, a few times. But on this scale, those weren't mistakes. Not even close. So that element was satisfied. They had full opportunity to cross-examine the witness about the data and about the criteria used. They could have put in any of that data they wanted. The fact is, they didn't want this evidence coming in under any terms. And to be clear, hopefully lay this out in the brief, the district court never said this was not coming in and did an about-face. It said, this is not coming in unless you lay an appropriate foundation. That was the court's ruling. They were on notice that from the start of the trial, the government signaled to Judge Marra that, look, we're going to be trying to lay that foundation you invited us to make. From the very start of trial, throughout the presentation, it was argued over multiple days. This wasn't some last-minute about-face on the eve of the closure of the government case where suddenly the district judge said, you know what, I know you've all traveled down a different path, but now I'm letting this stuff come in. That's not how it went down when you look at the trial record. So in all of those respects, and finally with regard to the Confrontation Clause issue, again, Judge Grant, I think you were part of the Palmer panel that addressed just this issue. When you're talking about underlying business records, you don't have a hearsay problem. There was full opportunity to confront a witness about the data extraction process and the criteria that were used. And again, my takeaway from this for the Court should be this was not a summary of a summary or some sort of hypothetical. It was a data pull using filters, all of which inured to the defendant's benefit, I would submit, rather than to his prejudice. And as we've argued in the brief, I don't think this evidence at the end of the day was prejudicial anyway, given the substantial other evidence of guilt. As to the multi-dosing, Your Honor, that went directly, again, to this claim that the defendant was making mistakes. Multi-dosing mattered because this defendant, by diagnosing wet ARMD as often as he did, could justify and put on those billing forms administering Lucentis. The issue in the case was these diagnoses were somehow justified or where they were wrong, for example, when they were on prosthetic eyes or blind eyes, that, well, those were mistakes. Because this defendant believed that he could bill three times for a vial of Lucentis that he either got for free, which the record reflects in some instances, or he paid approximately $2,000 for, he could bill for $6,000 or $8,000. That is core profit motive for somebody to lie. So it seems like Dr. Melgen is saying it was medically appropriate to reuse this drug three times from the same source. And you're saying whether or not that's true, if you only use one, you can't bill for three. That's exactly right, Judge Warren. I think the question of the legality of it does go to the second basis for the admission of the evidence, which is willfulness. I mean, certainly our vantage point was aside from profit motive, this showed his intent to disregard the law by the fact that he was disregarding these clear pronouncements. He put on evidence to say, well, I had a good faith belief that I could do this, or more accurately, I should be able to do this, notwithstanding the decrees. But Your Honor is 100% right. None of that has to do, whether it was permissible, whether it wasn't permissible. The fact is that evidence comes in as his profit motive. Let's say it was allowed. Let's say you could do that if you wanted to. That evidence still comes before this jury as proof. Why did he pick these demonstrably false diagnoses of wet ARMD so often? 79, I think, the total amount of patients he diagnosed with either the wet or the dry was 98%. Okay? These are extraordinary and ridiculous numbers. So you're correct. That evidence would have come in either way to prove his intent and motive and disprove the claim that it was either a combination of mistakes or somehow was legitimate diagnosis. And at the end of the day, the jury heard both sides of that argument in a six-week trial? Is that what it was? I think it was almost eight weeks. Oh, okay. And Mr. Ogrosky made reference to the fact that they were forced to call Mr. Melgen's attorney. Of course, they weren't forced to call anything. They wanted to develop that good faith. It was actually Mr. Ogrosky's partner, I believe, who testified and basically inserted an advice of counsel defense that had not been noticed and from the government's perspective was completely impermissible, even to the point of the last question that I think Mr. Ogrosky tried to elicit during the questioning of that attorney was, well, didn't Mr. Melgen believe all this? An utterly improper question. Court sustained the objection and struck that. But you could see what was going on with that testimony and that was decidedly over our objection. And I think when you look at this trial record, you'll see a district judge who ruled just as often in favor of the defense as in favor of the government, exercised incredible care under a pretty intense spotlight and handled this case the way we would want a district judge to handle it. Better than arbitration, right? Does the court have any other questions on other issues? I'm happy to address whatever the court is concerned about, but I'm confident to rest on the brief. Thank you. We appreciate the argument. Thank you, Your Honor. I was gonna ask if I could have his time. Probably not. Let me go back again to the peer charts. Under United States v. Jones, cited in the government's brief at page 19, confrontation clause violations are reviewed de novo. So it's a de novo review on these charts because it's a confrontation clause issue. Now let me address what he said. This was not simply a data pool. It required judgment. They had to decide who to pool. And those four criteria that they set, there's only one of them that has any factual basis in the record and it's not even consistent. Judge Haller and Fine were different and they were asked leading questions by the prosecutor and they weren't asked, who is Dr. Melgan's peer? Who are his peers? Because these are academic doctors from academic institutions, unlike the defense witnesses. They were asked, who's a retinologist? Or who's an ophthalmologist? So those have no bearing on this. Are you saying that someone, I think you're not, but are you saying that someone went through the Medicaid data line by line and made a judgment about whether people fit these categories or are there essentially columns that you can click in a giant spreadsheet to get this information? Someone did go through the Medicare data and decide, applying the criteria, which doctors to pool to compare to Dr. Melgan. And they were done at the prosecutor's direction. Right, but did they decide by individually looking at each entry or did they decide which broad criteria to use to pull the set of characteristics? I can't tell you what Ms. Minton did at the direction of the prosecutors other than she claims to have applied the criteria to extract that data. And that's the key point. It required judgment and decision making, which is testimonial in nature. It wasn't a data pool. Dr. Melgan's data, there was no objection to it coming in. They could put in all the charts they want saying he did this and he did that. And they did. What they did, though, was put in outrageous, ridiculous information that tainted him. I see that I'm out of time. I can finish. I have many more issues. No, no, no, I think we're good. Thank you. Appreciate you all coming early this morning. And we appreciate the argument. With that, we have finished our court week in Miami.